J-S38028-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.N., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1793 EDA 2024 |

Appeal from the Order Entered June 10, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000619-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: J.C.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.N., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1794 EDA 2024 |

Appeal from the Decree Entered June 10, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000458-2023

BEFORE:   STABILE, J., BECK, J., and STEVENS, P.J.E.*

MEMORANDUM BY BECK, J.:                    **FILED DECEMBER 2, 2024**

D.N. ("Mother") appeals from the decree[1] entered by the Philadelphia

County Court of Common Pleas ("trial court"), terminating her parental rights

_____

* Former Justice specially assigned to the Superior Court.

[1]  The trial court further entered an order on June 10, 2024, changing J.N.'s dependency permanency goal from reunification to adoption.  Mother does not challenge that order on appeal.

to her son, J.N., born July 2015, pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[2]  Because we conclude that the trial court did not abuse its discretion in terminating Mother's parental rights, we affirm.

On June 8, 2021, the Philadelphia Department of Human Services ("DHS") received a General Protective Services report and two Child Protective Services reports alleging that Mother struck J.N. causing him to suffer a black eye in or around the week of May 31, 2021.  Dependency Petition, 8/4/2021, at 4.  The reports also detailed that J.N. had scabies, for which he was prescribed medication, and autism, for which he did not receive any in-home services.  *Id.*  The reports further indicated that Mother had an intellectual disability, had been diagnosed with bipolar disorder, was not engaged in a course of treatment, was not compliant with her prescribed medication, used illegal drugs, might be engaged in prostitution, and had engaged in sexual activity while sharing a bed with J.N.  *Id.*  The reports stated that Mother had previously shared legal custody of J.N. with a family friend, and although she had recently regained full custody, she had abandoned J.N.  *Id.* at 3.

On June 15, 2021, the trial court issued a protective order temporarily committing J.N. to DHS's physical custody.  Order of Protective Custody, 6/15/2021, at 2.  It found that "continuation in the home would be contrary

_____

[2] DHS also petitioned to terminate the parental rights of J.N.'s presumptive father, and any unknown father.  Petition for Goal Change to Adoption, 11/21/2023, at 3.  Those petitions were granted without contest and are not at issue in this appeal.  *See* N.T., 6/10/2024, at 118, 124.

to the health, safety, and welfare of the child" and that DHS made reasonable efforts to prevent placement. *Id.* The trial court held a shelter care hearing the following day, at the conclusion of which it transferred legal custody of J.N. to DHS. Trial Court Order, 6/16/2021, at 1. On June 27, 2021, DHS placed J.N. in his current foster home. N.T., 6/10/2024, at 13. On July 28, 2021, the Community Umbrella Agency ("CUA") held an initial Single Case Plan ("SCP") meeting and determined that J.N.'s permanency goal was "Return to Parent" with objectives to be completed by Mother. Mother's goals were to obtain housing and employment, attend treatment for mental health, visit J.N., and complete Clinical Evaluation Units ("CEU"). *Id.* at 21-23. The trial court adjudicated J.N. dependent on September 1, 2021. Order of Adjudication and Disposition, 9/1/2021, at 1. Mother had weekly supervised visits with J.N. N.T., 6/10/2024, at 24.

Permanency review hearings were held regularly throughout the case, and at each, the trial court found J.N.'s placement continued to be necessary and appropriate, with Mother's compliance with her SCP goals ranging from minimal to moderate. *See* Permanency Review Order, 11/29/2021; Permanency Review Order, 3/2/2022; Permanency Review Order, 8/25/2022; Permanency Review Order, 11/28/2022; Permanency Review Order, 5/17/2023; Permanency Review Order, 12/06/2023; Permanency Review Order, 1/31/2024; Permanency Review Order, 3/26/2024.

On November 20, 2023, DHS filed a petition to involuntarily terminate Mother's parental rights and to change J.N.'s permanency goal to adoption. Petition for Goal Change to Adoption, 11/20/2023, at 3. The trial court held a hearing on the petition on June 10, 2024; at that time, J.N. had been outside of Mother's care for three years. N.T., 6/10/2024, at 7. The trial court held a hearing, at which it heard from the CUA case manager, Mother, the Child Advocate, and the Guardian ad Litem. *Id.* at 11, 91, 113-20. Ultimately, the trial court found that, based upon the amount of time J.N. had been in care, Mother's completion of only some (but not all) SCP objectives, Mother's lack of appropriate housing, and her failure to progress in visitation because of their irregularity, that termination was warranted. *Id.* at 120-22. The trial court further found that termination of parental rights would not destroy an existing, necessary, and beneficial relationship with Mother and the conditions necessitating J.N.'s placement would not be remedied in a reasonable amount of time. *Id.* at 122-24. The trial court thus issued a decree involuntarily terminating Mother's parental rights to J.N. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8), and (b), and entered an order changing J.N.'s permanency goal to adoption. Mother timely appealed to this Court and filed a Pa.R.A.P. 1925(b) concise statement.

Mother presents the following issues for our review:

1. Whether the trial court committed reversible error, when it involuntarily terminated [M]other's parental rights where such determination was not supported by clear and convincing

evidence under the Adoption Act, 23 Pa.C.S.[] § 2511(a)(1), (2), (5) and (8).

2. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical, and emotional needs of the child as required by the Adoption Act, 23 Pa.C.S.[] § 2511(b).

Mother's Brief at 8.

Our standard of review is well settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48 (Pa. Super. 2024) (citation omitted).

"Termination of parental rights is governed by [section] 2511 of the Adoption Act and requires a bifurcated analysis." *Id.*

- 5 -

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citation omitted, brackets in original). Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* at 48-49 (citation omitted).

As stated above, the trial court terminated Mother's rights to J.N. pursuant to section 2511(a)(1), (2), (5), and (8). N.T., 6/10/2024, at 124. "[W]e need only agree with its decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). We focus our analysis on section 2511(a)(8).

Mother argues that the trial court erred when it terminated her parental rights pursuant to section 2511(a)(8). Mother's Brief at 15. Mother claims that her only obstacle to reunification is lack of housing which she was "never provided assistance in obtaining outside of programs through the Achieving Reunification Center." *Id.* at 15.

To terminate parental rights under subsection (a)(8), the petitioner is required to establish three elements:

- 6 -

(1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child.

*L.C.J.W.*, 311 A.3d at 49 (citation omitted); *see also* 23 Pa.C.S. § 2511(a)(8).

Section 2511(a)(8) "does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children." *L.C.J.W.*, 311 A.3d at 49 (citation omitted). Instead, the "relevant inquiry regarding the second prong of [section] 2511(a)(8) is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *Id.* (citation omitted).

The record reflects that J.N. had been in placement for approximately three years at the time of termination—the trial court removed him from Mother's care in June 2021. N.T., 6/10/2024, at 120. Assessing Mother's compliance with her SCP goals, the trial court explained that "[Mother's] [s]ingle case plan objectives [] included housing, employment, addressing mental health, CEU dual diagnosis assessment, as well as visits." *Id.* at 121. Although Mother has employment and receives income from Social Security because of her intellectual disability, she continues to lack appropriate housing. *Id.* Mother discontinued her mental health treatment in September of 2023, but reengaged in March 2024, and reportedly is consistent with her

participation. *Id.* Mother does not need drug and alcohol treatment. Mother visits with J.N., and they reportedly go well. Because Mother's visits have been "irregular," they have never progressed beyond supervised visits at the agency over the course of three years. Further, although J.N. does know Mother as his mother, the testimony did not support a finding that it was a traditional parent/child relationship. Instead, the trial court found that it is more of a friend relationship, with Mother bringing J.N. candy and playing on Mother's phone together. *Id.* at 123. Mother also failed to complete parenting classes, although she did engage in some services with ARC. *Id.* at 122.

As for J.N.'s placement, the trial court found that he "has a loving relationship with the foster parent, as well as the foster family[.] [I]t's a traditional mother/son relationship, where he has stability, and to whom he goes for support as well as guidance." J.N. refers to his foster mother as his "second mom." *Id.* Our review of the record supports the trial court's conclusions. Mother does not dispute, J.N. has been in care for more than twelve months. The trial court removed J.N. from Mother's care because of "abandonment, behavioral health concerns, inadequate, basic needs, inadequate healthcare, substance abuse by Mother, [] inappropriate behavior in the presence of a child, and inappropriate discipline." *Id.* at 19. Mother, according to her SCP objectives, was to obtain housing, employment, address mental health, comply with a CEU dual diagnosis assessment, and participate in visits with J.N. *Id.* at 121. At the time of the termination hearing, Mother

did not complete her SCP objectives, and concerns remain about her ability to parent J.N., her mental health, and her housing. *Id.* Although Mother argues that her only barrier to reunification was housing and that she had completed the programs through the ARC, the record does not bear this out. Moreover, even if this was true, Mother presented no evidence at the hearing that she was able to find appropriate housing in the near future.

Turning to the needs and welfare analysis required under subsections (a)(8) and (b),[3] Mother argues that the trial court erred because the "DHS failed to produce sufficient evidence that a bond [does not] exist between mother and child." Mother's Brief at 16. Mother also points out that J.N. stated to the Child Advocate that he wanted to return to the care of his mother. *Id.*; *see also* N.T., 6/10/24, at 114.

> Section 2511(b) provides:
>
> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the

---

[3] Although separately enumerated, this Court has interpreted the needs and welfare analyses required under subsections (a)(8) and (b) to utilize the same legal standards and to be based upon the same evidence. *See Matter of Adoption of M.A.B.*, 166 A.3d 434, 448 (Pa. Super. 2017) (combining discussion of the children's needs and welfare pursuant to subsection (a)(8) and subsection (b) because the "third element of [s]ection 2511(a)(8) requires that the [o]rphans' [c]ourt conduct an analysis similar to that required under [s]ection 2511(b)").

conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

[C]ourts should consider the matter from the child's perspective, placing [his] developmental, physical, and emotional needs and welfare above concerns for the parent.

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, i.e., specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider whether the children are in a [preadoptive] home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*L.C.J.W.*, 311 A.3d at 51–52 (citation omitted).

The trial court does not have to consider the bond between parent and child "over all other needs and welfare considerations." *Interest of M.E.*, 283 A.3d 820, 839 (Pa. Super. 2022). The trial court should instead "weigh any pain from breaking the bond against other considerations as to what result serves the child's needs and welfare." *Id.* When conducting its needs and welfare analysis, the trial court must also consider "whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs,

- 10 -

including intangible needs of love, comfort, security, safety, and stability." ***Interest of K.T.***, 296 A.3d 1085, 1113 (Pa. 2023).

The record reflects that J.N. has been in the same foster home for three years. N.T., 6/10/2024, at 13. He has a bond with his foster family, his foster family meets his educational, emotional, and medical needs, and J.N. turns to his foster mother for love and support. ***Id.*** at 13-17. At the termination hearing, the CUA case manager classified the bond between J.N. as "a traditional mother and son relationship." ***Id.*** at 17.

In contrast, the CUA case manager testified that J.N.'s relationship with Mother was more "like a brother and sister bond." ***Id.*** at 28. Furter, the record reflects that Mother's visits until December of 2023 had been sporadic, and the CUA case manager testified that J.N. would not suffer any irreparable harm if the parental rights of Mother were terminated. ***Id.*** at 28, 36.

The trial court found the CUA case manager's testimony to be credible.

> [J.N.] would not suffer irreparable harm if Mother's rights were terminated. He feels strong about remaining with [foster mother][,] where he has stability, love, and support, and every – and everything you can imagine[.] [T]ermination of parental rights would not destroy an existing, necessary and beneficial relationship. Termination would not cause [J.N.] irreparable harm. And, unfortunately, the conditions that necessitate placement will not be remedied in a reasonable amount of time. This young man deserves permanency.

***Id.*** at 123-124 (cleaned up). The trial court thus found that termination best served J.N.'s needs and welfare.

Based on the record before us and the standard of review we must employ, we discern no abuse of discretion in the trial court's conclusion that J.N. is bonded with his foster family, that they meet his needs and provide for his educational, emotional, medical, and physical welfare, and that J.N. will not be irreparably harmed by terminating Mother's parental rights. Although it is clear that Mother loves J.N., it is well settled that a parent's own feelings of love are not sufficient to show that termination would not best serve the child's needs and welfare. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). Accordingly, we conclude that the trial court did not err or abuse its discretion in determining that J.N.'s developmental, emotional, and physical needs and welfare are best met by terminating Mother's parental rights.

We therefore find no error of law or abuse of discretion in the trial court's finding that DHS proved grounds to terminate Mother's rights under section 2511(a)(8) and (b) by clear and convincing evidence. We therefore affirm.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/2/2024

- 12 -